1        UNITED STATES DISTRICT COURT

2     CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION

3     HONORABLE ANDRE BIROTTE JR., U.S. DISTRICT JUDGE

4

5   UNITED STATES OF AMERICA,              )
                                           )
6                  Plaintiff,              ) CASE NO.
                                           ) CR 22-108-AB
7        vs.                               )
                                           )
8   HYOUNG NAM SO,                         )
                                           )
9                  Defendant.              )
    _____)
10

11

12

13

14          REPORTER'S TRANSCRIPT OF PROCEEDINGS

15             MONDAY, FEBRUARY 27, 2023

16                   1:10 P.M.

17             LOS ANGELES, CALIFORNIA

18

19

20

21

22   _____

23            MAREA WOOLRICH, CSR 12698, CCRR
          FEDERAL OFFICIAL COURT REPORTER
          350 WEST FIRST STREET, SUITE 4311
24          LOS ANGELES, CALIFORNIA 90012
              mareawoolrich@aol.com
25

1    **APPEARANCES OF COUNSEL:**

2

3    **FOR PLAINTIFF:**

4        OFFICE OF THE UNITED STATES ATTORNEY
         By:  Jeff P. Mitchell

5        Assistant United States Attorney
         312 North Spring Street

6        Los Angeles, CA 90012

7

8    **FOR DEFENDANT:**

9        REED SMITH
         By:  Daniel H. Ahn, Attorney at Law

10       355 S. Grand Avenue, Suite 2900
         Los Angeles, CA 90701

11

12       LAW OFFICES OF H. DEAN STEWARD
         By:  H. Dean Steward, Attorney at Law
         -and- Courtney Cefali, Attorney at Law

13       17 Corporate Plaza, Suite 254
         Newport Beach, CA 92660

14

15

16

17

18

19

20

21

22

23

24

25

**UNITED STATES DISTRICT COURT**

```
 1              LOS ANGELES, CALIFORNIA; MONDAY, FEBRUARY 27, 2023

 2                          1:10 P.M.

 3                          -oOo-

 4

 5              THE COURTROOM DEPUTY:  Calling Item No. 3,

 6    Case No. CR 22-108-AB, United States of America versus

 7    Hyoung Nam So.

 8              Counsel, please state your appearances.

 9              MR. MITCHELL:  Good afternoon, Your Honor.

10    Jeff Mitchell on behalf of the United States.

11              THE COURT:  All right.  Good afternoon.

12              MR. AHN:  Good afternoon, Your Honor.  Daniel Ahn

13    with Reed Smith on behalf of Mr. So who is here on his own

14    recognizance.  And with me at counsel table is Dean Steward and

15    Courtney Cefali, co-counsel on this matter.

16              THE COURT:  All right.  Good afternoon.  Nice to see

17    everyone.  It's been a long time for a number of folks, and I

18    was going to tease Mr. Ahn our paths continue to cross over and

19    over again from law school until the current date.

20              All right.  So we are here today on the motion to

21    dismiss the Indictment.  I've had a chance to review the

22    motion.  I have a couple questions that I wanted to ask the

23    parties.  Just bear with me one moment, please.

24              So why don't I start with Mr. Mitchell, with the

25    government first.  Obviously, the defense raises a number of
```

```
 1   issues here.  Let me ask you.  Has the Korean government
 2   provided any additional documents in response to the MLAT
 3   request since November of 2020?
 4              MR. MITCHELL:  Yes, Your Honor.  In my opposition, I
 5   kind of outlined some of the additional documents that they did
 6   provide including some of the certificates that came, I
 7   believe, in 2022 as well.
 8              THE COURT:  Okay.
 9              MR. MITCHELL:  But we are not relying on those
10   certificates as an extension of the MLAT.
11              THE COURT:  All right.  But there were some
12   additional documents, okay.
13              MR. MITCHELL:  Yes.
14              THE COURT:  Look, obviously the defense lays it out.
15   And forgive me for both sides.  I probably will be asking
16   questions that are in the papers, but I just want to hear it
17   from the parties directly.
18              So, you know, defense would argue, given that
19   South Korea wasn't able to produce additional documents in
20   response to your follow-up request for those certified copies
21   of the -- I may be mispronouncing -- Busan, B-u-s-a-n, reports.
22   Does that suggest that the last production you received was,
23   in fact, the final response?
24              MR. MITCHELL:  No, Your Honor.  The *United States*
25   *versus Bischel* answered that question conclusively, and it said
```

```
 1  that, no, because you can never know it's the last of
 2  something.  So that is where the 9th Circuit has said that it
 3  doesn't necessarily matter when the last document was produced.
 4  What the issue is when the foreign authority gave an up or down
 5  dispositive answer to each and every item requested.
 6          THE COURT:  But under that rationale, could the
 7  government -- I'm not saying that's the case here -- play
 8  games, if you will, because how often does a foreign country --
 9  you never know what the last document is; right?  So if that's
10  the case, does that mean that the statute of limitations just
11  sort of runs forever?
12          MR. MITCHELL:  No, Your Honor.  Several of the
13  appellate courts have noted and expressed that same concern.
14  But they noted that Congress had put in a time limit there.  So
15  that is generally not a concern to the appellate courts.  And
16  everything should be taken into account.
17          But it's not -- I don't think that concern about the
18  government's trying to drag things on is the issue here because
19  it's based on an objective determination of whether or not they
20  answered all of our rogatories or requests for documents, you
21  know, within the MLAT here.  And I think the question for this
22  Court is, you know, at what point did they give us like a final
23  dispositive answer to the Busan reports which I have
24  categorized as the missing Busan reports, those six documents.
25          THE COURT:  But it's interesting though, and maybe
```

1    I'm over analyzing this.  But does the statutory requirement,

2    you know, the three-year safeguard; right?  And then there's

3    the final action.  Why have both if, at the end of the day, one

4    could argue it is kind of ongoing it seems?

5              MR. MITCHELL:  Well, I think it's an interplay

6    between these two compelling forces.  One is we want the

7    government to be able to obtain the documents and bring their

8    criminal cases without hindrance from foreign authorities.  At

9    the same time, we also want to give the protections to

10   defendants of due process and having a speedy trial.  So that's

11   my understanding of Congress's intent with having both of those

12   provisions within the statute.

13             THE COURT:  Okay.  All right.  Thank you,

14   Mr. Mitchell.

15             Let me ask Mr. Ahn, if I could, or I don't know

16   who's drawn the short straw.

17             MR. AHN:  That's me, Your Honor.

18             THE COURT:  All right.  Mr. Ahn.  I mean, I had to

19   read these papers numerous times because you raise a lot of

20   important issues.  And, I guess, you know, you start with the

21   *Afshari*, A-f-s-h-a-r-i, case which obviously seems helpful to

22   the defense.  But then when I'm looking at the case, at least

23   my sort of reading of it, is that it seemed as if the Court was

24   tolling certain statutes because of the factual basis.

25             I mean, I think even in the case one count wasn't

**UNITED STATES DISTRICT COURT**

1   tolled because the Court said it didn't refer to any offense

2   concerning the procurement of citizenship or naturalization.

3   Not that it didn't refer to a statute.  It just referred to an

4   offense concerning it.

5          And so does that suggest that the -- it's not so

6   much the statute but a broader reading of like what the most

7   important thing is does it encompass the facts, and if that's

8   the case, conspiracy to commit versus the underlying charge

9   seems to encompass that.

10         MR. AHN:  So I would respond this way, Your Honor.

11   So *Afshari* actually, I think, is squarely on point.  Because it

12   is true.  Judge Carter in that case found that one count was

13   untimely.  But if you look at the reasoning that Judge Carter

14   used, it's actually quite telling and categorically supportive

15   of the defense's position.

16         He begins by saying, "The tolling application and

17   order did not refer to an offense."  The offense is how he

18   defined it at the outset of his opinion which was a statutory

19   charge, a particular crime.

20         And then he goes on to say -- and it's sort of icing

21   on top of an already frosted cake.  Not only that but not only

22   the facts don't even support it here as well.  That's mere

23   dicta, Your Honor.  The holding of the case is that the tolling

24   application and order did not reference a statutory violation,

25   and therefore, the statute of limitations was not tolled.  That

```
 1    is the outcome that precisely follows in this case.
 2              And I would say on top of that, Your Honor, two
 3    things.  Number one, Judge Carter's opinion is in line with
 4    those two 9th Circuit cases that we cited in our motion which
 5    the government doesn't even touch, left completely untouched.
 6    Miranda and Russell.
 7              I think those cases all but resolve this case.
 8    Those cases say by 1968 and certainly by 1984 -- and that date
 9    is significant -- that's when our tolling statute 3292 was
10    enacted.  And the Supreme Court has said you look at
11    contemporaneous meaning.  The 9th Circuit has already opined on
12    contemporaneous meaning.
13              By 1984, when this tolling statute was enacted,
14    offense meant a statutory violation, a discrete criminal
15    violation with separate elements of proof, not a course of
16    conduct.
17              THE COURT:  But if I accept your analysis, then that
18    means the government every time they do an MLAT request or
19    application, they better make sure they list every possible
20    statute for if they fail to do so, they run the risk of the
21    case getting dismissed.
22              MR. AHN:  I think that's right, Your Honor.  That
23    follows not only from 9th Circuit precedent but the statute
24    itself.  3292 required the government to say in its application
25    to the duty district judge these are the offenses for which we
```

1  believe evidence will be found abroad, and these are the

2  offenses that are under investigation by the grand jury.  The

3  statute itself compels that reading, Your Honor.

4          And so I would say not only is it 9th Circuit

5  precedent, it's the statute.  Judge Carter got it right, and

6  these sources cross-corroborate and produce only one outcome

7  here which is in this case the charged offense is untimely.

8          THE COURT:  So okay -- it's interesting.  I mean,

9  this is what happens when you have a bunch of District Court

10 opinions and at least, in my view, nothing that's binding I

11 don't think.  Because like you look at the -- I'm going to

12 mispronounce it -- the *Swartzendruber* case, you know, they talk

13 about intimately related.  I mean, that seems to broaden

14 things.  But I guess you would say that judge is wrong and

15 Judge Carter is right.  And since Judge Carter is my friend, I

16 should adopt his recommendation?

17         MR. AHN:  Not only that, Your Honor, but

18 *Swartzendruber* and *Neill* and those other out-of-circuit

19 district cases are just that, out of circuit.

20         Here in the 9th Circuit, we have *Miranda*, and we

21 have *Russell*.  And that is binding precedent that those

22 district courts didn't have to grapple with.

23         But Judge Carter got it right in light of those

24 cases.  And, Your Honor, we would submit to you the Court

25 should follow those cases.  Those cases resolve this case

1   simply.  It's a simple case, Your Honor, in my view.

2          THE COURT:  Mr. Mitchell, what's your response?  I

3   mean, you did not -- I may have missed it, but I don't think

4   you responded to those cases that *Miranda*, and I forget the

5   other name -- *Russell*.

6          MR. MITCHELL:  *Russell*.  Your Honor, I don't recall

7   those two cases being on point here.  I don't recall them

8   dealing with our issues here which is why I didn't address

9   them.  There were over 40 cases, none of which I felt were

10  really on point here.  And --

11         THE COURT:  Are you saying that -- what about

12  Judge Carter's case?

13         MR. MITCHELL:  Well, Judge Carter's case is

14  discussed, and I can turn to that now.  And I think the subtle

15  that the Court hit upon is something that I missed in my

16  opposition brief but came over the weekend while reading this.

17  And I think the section the Court was referring to was Section

18  C when it was referring to the dismissing of the 1425 Count for

19  procurement of citizenship unlawfully.

20         And, I think, counsel's memory of what Judge Carter

21  said is not accurate.  I think counsel said that Judge Carter

22  said that the application did not refer to the offense.  But

23  the precise language that Judge Carter used was that the

24  tolling application does not refer to any offense --

25         THE COURT:  Any offense.

1          MR. MITCHELL:  -- concerning the unlawful

2     procurement of the citizenship nor did it refer to the statute

3     or otherwise describe any relevant facts from which it could be

4     concluded that the offense alleged in the Indictment was within

5     the offenses under investigation.  So I think it's broader than

6     what counsel is suggesting, and it's consistent with every

7     other Court that has looked at this.

8          And then to answer to counsel's, I guess, his way of

9     the way things should be done which is to kind off lay out

10    precisely every single offense that we are looking at, if the

11    Court were to adopt that as the holding and the best course of

12    action for the government, that would require the government to

13    go back and get subsequent MLATs, subsequent translations,

14    submit the subsequent MLATs to all the foreign authorities and

15    then to come back and get subsequent tolling applications from

16    district courts.

17         It creates unnecessary amount of work for United

18    States government, for the district courts, and for the foreign

19    authorities.  So it creates these hurdles are unnecessary and

20    not what Congress intended.

21         The intention of 3292 was to make it easier for

22    obtaining foreign documents from foreign authorities to bring

23    these criminal cases.  And counsel's suggestion would actually

24    undermine that intent completely.

25         THE COURT:  Okay.  Mr. Ahn, anything you wish to say

```
 1   in response?

 2             MR. AHN:  Yes.  Thank you, Your Honor.

 3             So if you'll notice, my friend on the other side did

 4   not mention the key point in Judge Carter's decision which is,

 5   when he refers to the offense, it's a term of art that he

 6   defined at the outset of the opinion.  He did articulate

 7   several reasons why with the government submission was

 8   defective.  There was no reference to the statutory violation,

 9   no facts from which one can infer.

10             THE COURT:  But isn't that key though?  He says

11   refer to any offense concerning procurement or -- like any

12   offense.  Maybe I'm focusing on the wrong word.  It just seems

13   like that to me suggests more of an umbrella approach of -- and

14   that's why he dismissed Count 31 because there was nothing

15   related to it.  Whereas here -- I'm just struggling with sort

16   of what is the intent?

17             It seems to me that what you are asking is a very

18   strict -- and I may be wrong on that.  A strict interpretation

19   such that every MLAT request -- I mean, the flip side would be

20   I guess going forward that the government would have to

21   basically cite the whole United States Code to avoid excellent

22   lawyers like yourself making a motion to dismiss because you

23   didn't cite it at this point, and so therefore, you know, you

24   run the risk of a motion to dismiss.

25             MR. AHN:  I would say, Your Honor, it's no more
```

1    strict than a bevy of other process that the government has to

2    do in federal criminal cases.

3           Just imagine, for example, wiretap orders which I'm

4    sure this judge has seen a lot of.

5           THE COURT:  Unfortunately.

6           MR. AHN:  As this Court knows, in order to get a

7    wiretap, that needs to be grounded in a predicate offense.

8    Those predicate offenses have to be set forth in a wiretap

9    application and order.  And if a predicate offense is missing,

10   poof, there goes the wiretap.

11          This is the same sort of scenario.  Congress has

12   decided that in this situation they want an offense listed in a

13   tolling application and order.  And I think that makes imminent

14   sense, Your Honor.  Just think broader context.  There are just

15   a few peacetime tolling statutes that I can think of, maybe

16   four or five.  3292 is one of them.

17          But putting 3292 to the side, every other tolling

18   statute operates based on the defendant's conduct.  So if you

19   are a fugitive from justice, for example, you forfeited your

20   right to the normal statute of limitations, and therefore it's

21   tolled.  Or if you are concealing assets in a bankruptcy, you

22   forfeited your right.

23          3292 is the only statute of limitations that I know

24   of based on prosecutorial convenience.  And in order to balance

25   that out with the values that underlie statute of limitations,

1    finality, certainty, predictability, administration of justice,

2    fairness to the defendant, they specifically required that

3    offenses be listed in a tolling application and order.  I think

4    that's imminently fair, Your Honor.

5            I would just add this.  In statutes of limitations,

6    they are strictly construed against the government.  The

7    Supreme Court has said that.  And I think that principle

8    applies full force for 3292 based on the backdrop that I just

9    articulated.  And it also applies to the word "offense."

10           If there were any ambiguity or doubt or if the judge

11   -- if the Court were wrestling with fairness issues, I think

12   that principle all but requires the Court to find that it has

13   to be strictly construed here, offense means what the 9th

14   Circuit said it means, and therefore they need to be

15   articulated in the application and order, not burdensome,

16   imminently fair.

17           THE COURT:  All right.  Thank you.

18           Let me ask you, Mr. Ahn, in the *Bischel* case,

19   B-i-s-c-h-e-l, the Court concluded that the final action was a

20   dispositive response to both the request for records and the

21   certificate of authenticity.

22           Here in this case, we don't have -- we have an

23   uncertified copy of the Busan report.  Does that mean that

24   there are outstanding actions that need to be taken to obtain

25   those certified copies?

1          MR. AHN:  No, Your Honor.  So in this case, as the

2     government conceded, they are not relying on that

3     certification, and that's for a good reason.  It's because

4     there are no Busan reports to certify.  They have their

5     unofficial copy, but Korea never provided the Busan reports.

6     So that doctrine falls away.

7          So in this case, I think the test that applies is

8     the test that Mr. Mitchell articulated which is did Korea

9     provide a thumbs up or a thumbs down?  Did they say that they

10    can comply or they can't comply?

11         And in this case, Your Honor, I think the simplest

12    and narrowest path to finding that there was final action is

13    the November 2020 response by the Korean government where the

14    U.S. government had submitted their follow-up requests for the

15    Busan reports.  That was May 2020.  And then a few months later

16    in November, Korea said we have no data.  That's a quote.  No

17    data.

18         And in terms of all the other Busan report stuff you

19    are looking for, we've replied already.  We've given you what

20    we have.  Your Honor, that's a thumbs down.  We don't have it.

21    Additional information is not going to be forthcoming.  And

22    that's a dispositive response.

23         In fact, it's more dispositive than the October 2021

24    response that the government relies on.  That response simply

25    says it was deleted.  That tells you why they don't have it,

1    but the whether is the antecedent question that the Korean

2    government had already answered.

3             And by saying no data, it encompasses deletion.  And

4    so no means no, Your Honor.  It's plain speak.  It's plain

5    English.  It's easy for litigants to follow.  So for the

6    government to say that that's not dispositive is really bending

7    the language to a breaking point.

8             And so I would submit, Your Honor, that Your Honor

9    should find that there was final action in November 2020.

10   That's when Korea provided a dispositive response.  The

11   additional documents that Korea provided are neither here nor

12   there.  That's under the 9th Circuit's case in *Hagege*.  And

13   that's all the Court has to do to resolve that issue.

14             THE COURT:  All right.  Thank you.

15             Mr. Mitchell, anything you want to say in response?

16             MR. MITCHELL:  Yes, Your Honor.  I would actually

17   like to just pull up the exhibit or the November 30th letter we

18   are talking about here.  This is defendant's moving paper

19   Exhibit S.

20             THE COURT:  Okay.

21             MR. MITCHELL:  The first page is a cover letter from

22   OIA to us.  And then on the second page is the official letter,

23   cover letter, from the Ministry of Justice.  Does the Court

24   have that?

25             THE COURT:  I'm looking for it now.  S; right?  Yes.

1    The letter is dated December 1, 2020?

2             MR. MITCHELL:  That's the letter from OIA to the

3    U.S. Attorney's Office.  On the second page is the letter from

4    the Ministry of Justice to Korea.

5             THE COURT:  Dated November 30th.

6             MR. MITCHELL:  Correct.

7             THE COURT:  I see that.

8             MR. MITCHELL:  That is the official letter that we

9    received from Korea.  Nothing in this letter indicated that

10   they were closing the matter, that anything had been deleted.

11   It was just here's some documents for you.

12            THE COURT:  So, in your view, to use Mr. Ahn's word,

13   it is not a thumbs up or a thumbs down?

14            MR. MITCHELL:  Correct.  In this cover letter, it

15   was just here are documents.  No thumbs up.  No thumbs down.

16            The next page in their exhibit is titled "Result of

17   executing the request of mutual assistance."  Does the Court

18   see that?

19            THE COURT:  I see it, yes.

20            MR. MITCHELL:  That was not the document we received

21   from Korea.  This is their translation of it.  The actual --

22            THE COURT:  This is the infamous Exhibit S.  It's a

23   central part of this discussion.  I'm just curious.  Has there

24   been a certified copy obtained at all?

25            MR. MITCHELL:  So the Exhibit S never -- does not

1    contain the Busan reports.

2          THE COURT:  Okay.

3          MR. MITCHELL:  Those are the six documents that we

4    repeatedly went back to Korea.  Those reports were translated

5    and provided by defense counsel as Exhibit, I think it is, 12

6    through 17 in their reply brief.

7          No, we never got certified copies from the Republic

8    of Korea.  But we know that they had them at one point in time,

9    and we wanted the certified copies which is why we went back to

10   them repeatedly.

11         But coming back to Exhibit S, we didn't have the

12   English document here.  It was just the Korean documents, and

13   it was part of a stack of Korean documents that were

14   provided.  These were written not on official letterhead by the

15   Republic of Korea, not on any type of official letterhead from

16   the prosecutors.  This was just documents provided by the local

17   prosecutor.

18         So my first position is that 3292 states that the

19   final action date is when the foreign authority takes final

20   action, gives a dispositive up or down.  A local prosecutor is

21   not the foreign authority here.  That is the Ministry of

22   Justice.  That is the person communicating with the Office of

23   International Affairs who are writing these cover letters.

24         In all of the cases that do discuss final action

25   dates, they refer to the cover letters provided by those

foreign governments.  And that make sense because those cover letters are written in English, and then the lawyers can then review it to see if there is something in there that gives us a final action or a dispositive answer.

I don't speak or read Korean.  The case agent is not a lawyer.  So to require the case agent to legally analyze the documents that are in there to see if there is a final --

THE COURT:  Thumbs up or thumbs down.

MR. MITCHELL:  Right.  It's not fair to the agent. He's not a lawyer.  And it's not fair to the prosecutor who doesn't speak Korean.  We've had over 2,000 pages produced to us.  We can't translate everything.

And their conversation with the agent was did you get the Busan reports?  No, I didn't get the Busan reports. The very next business day we reached out to OIA and said we are still missing these.  And they said there was a change in the prosecutors in Korea, *why don't you give us additional information, we'll see if they can do it.*

And the Korean authorities did not look at this as a dispositive action.  They didn't say that we were closing this case.  They didn't say that the matter was concluded.  What they actually do is they say *let us propose another option to you the United States*.  This is in their Exhibit Y you can see it.

THE COURT:  Right.

1          MR. MITCHELL:  And they are suggesting *why don't you*

2    *tell us who -- where you obtained these documents and when you*

3    *obtained them, and we will see if we can track them down and*

4    *get them certified for you.*  Because there was just a change in

5    turnover, and there was a miscommunication, we believe, on who

6    was actually in charge of these documents.

7          But even going to the actual translation of the

8    document itself, towards the top it says, "In April 2019 the

9    requested data was extracted from the above case reports."  So

10   it implies that there is a larger case file here that the

11   documents were extracted from.

12         And then below that where the result of the

13   execution is that there's no data on the meeting between MIT

14   and G.M. employees in the record of the related case.

15         Your Honor, with the translations, still it's not

16   clear to me that they, you know, didn't have any data at this

17   point.  And we know that these records do exist, Your Honor.

18   We had unofficial copies.  So it wasn't objectively

19   unreasonable for us, for the very next business day to say,

20   *look again, here are the dates, here are the titles of those*

21   *reports*.  And then Korea asked us to provide the unofficial

22   copies so they can track them down.

23         So I think based off of all of this evidence it was

24   not objectively unreasonable for us to believe that the matter

25   was not concluded, that it was still ongoing.

1          THE COURT:  All right.  Mr. Ahn, I assume you have

2     something you wish to say?

3          MR. AHN:  Yes.  I think counsel's argument really

4     drives home the point that the 9th Circuit cautioned against

5     which is you just never -- you can never tell when the last of

6     anything has happened.  So there has to be a stopping point.

7     And --

8          THE COURT:  But the question is -- well, I guess

9     that's why we are here.  How do you define the stopping point.

10          Go ahead.

11          MR. AHN:  I appreciate that, Your Honor.  That takes

12     me to my next point which is, if you look at the November 2020

13     response, there's a cover letter from OIA.  There's a cover

14     letter from the Ministry of Justice.

15          THE COURT:  But there's nothing in that cover

16     letter that -- again, I'm just using your terms for convenience

17     sake -- that gives a thumbs up or thumbs down.  It just says,

18     "In regards to the above noted request, enclosed please find

19     materials which have been obtained."  It doesn't say *this*

20     *concludes our review, we've responded to all your requests*.

21     It's just a cover letter; right?

22          MR. AHN:  That's right.  But it doesn't have to.

23     The cover letter itself doesn't have to explicitly say that.  I

24     don't know of any Court that has squarely held that.

25          Typically what Courts do is they look at the

1   submissions in context, and then they decide based on the

2   totality of circumstances, including the materials provided,

3   does it appear that they've completed their task?  In *Bischel*,

4   for example, had I think it was the UK provided certification

5   alone without any cover letter, my reading of the case suggests

6   that that would have been completely fine, that would have been

7   final action regardless.  You don't need a cover letter for

8   that.

9           And although the government nickels and dimes the

10  November 2020 response, if you just apply the government's own

11  logic to the October 2021 response, then that's not final

12  action either.  Because although it said it deleted things, it

13  didn't say everything.  I mean, so you could always go down

14  that path.

15          And I just -- I submit to the Court that that's just

16  a lawyerly non-plain speak reading of these documents, and

17  that's not something that the case law contemplates.  This is

18  somebody's livelihood and liberty on the line.  The question is

19  not whether the government had an objective basis to follow up.

20  It's whether Korea's response was a dispositive response, a

21  thumbs up or a thumbs down.

22          And I would say this about the October 2021 response

23  as well.  That is an odd one for the government to grasp at and

24  say this is final action.  As the Court notes, there is no

25  cover letter that accompanies the October 2021 response.

UNITED STATES DISTRICT COURT

1           And you heard from OIA, not from the Ministry of

2     Justice.  There's not even a date on this letter or whatever

3     this is, this document.  The date that the government uses is

4     from an email from OIA.  It lacks all the official

5     accoutrements, if you will, a finality that actually accompany

6     the November 2020 response.

7           I submit, Your Honor, this is not a close question.

8     This is an easy case for finding final action in November 2020,

9     and we would respectfully urge the Court to do so here.

10          THE COURT:  All right.  Well, thank you, Counsel.

11          Mr. Mitchell, go ahead.

12          MR. MITCHELL:  Just briefly, Your Honor.  Coming

13     back to the November 30th cover letter that the Court has

14     indicated, the cover letter states that "Please find materials

15     which have been obtained by the Busan District Prosecutor's

16     Office enclosed."  It doesn't say *Please find attached a letter*

17     *summarizing the Busan prosecutors' due diligence looking for*

18     *these files*.  If it had been, it would have put us on notice to

19     look for those type of documents to get a better understanding

20     of it.  It just said, materials have been obtained.

21          And coming back to the October 26 -- I think it's

22     2021 letter which is Exhibit O, I don't understand why counsel

23     doesn't believe that this language is vague.  I agree with

24     counsel that I wish it would have been -- I wish the Korean

25     government would have included a cover letter with this, but

1   they did not, and we can't control that.

2            But the report that came to us from Korea was

3   written both in Korean and in English.  So we were able to read

4   it.  And it states, "Business trip report and other seized

5   files were stored in the forensic center's server.  The files

6   were deleted."  I mean, that is clear.  The business trip

7   reports are the Busan reports that we've been asking them for

8   that we sent them the unofficial copies.  And they said that

9   those reports were stored on the central servers and they were

10  deleted.

11           So I believe that is definitive that they don't have

12  it anymore.

13           THE COURT:  All right.  Well, thank you, Counsel.  I

14  appreciate it.

15           MR. AHN:  Your Honor, may I just add one other

16  thing?  And I'm sorry to belabor this.

17           THE COURT:  Go ahead.  Out of professional courtesy

18  only because I like Mr. Steward, I'll let you continue.

19           MR. AHN:  Thank you, Your Honor.  I do apologize.

20           But I just wanted to circle back very briefly on the

21  Court's point about Judge Carter's language and also about,

22  well, shouldn't I just look at sort of the context, the

23  narrative in the tolling materials.

24           I would submit to Your Honor that even if the Court

25  were -- first of all, we have our threshold argument which is

1   that the law aside, the text of the tolling order itself binds

2   the government, did not toll 371, and therefore, the Court

3   doesn't even have to parse the statute.  So that argument has

4   been untouched yet again in oral argument.

5           Second, if the Court does then move on to the text

6   of the statute and just wants to look at context, I would

7   submit that the context doesn't make it abundantly clear that

8   conspiracy is reserved.

9           Here's the tolling materials.  Here's what it

10  conveys.  There are five charges listed in the tolling

11  materials.  None of them are conspiracy charges.  The tolling

12  materials then note that the two main would be co-conspirators

13  have all received non-prosecution agreements.  So that leaves

14  only Mr. So and a bunch of money laundering mopes.

15          That conveys to me that the government wasn't even

16  contemplating conspiracy at that point.  This is 2020.  This is

17  when they thought the statute was going to expire in just a few

18  months.  And so even if the Court were to assess this on the

19  basis of a narrative, it's no foregone conclusion that

20  conspiracy is reserved.  But the Court doesn't even have to

21  reach that issue because I think the statutory language is just

22  so clear.  But I wanted to end with that, Your Honor.  Thank

23  you.

24          THE COURT:  And I appreciate it.  Obviously the

25  lawyers think it's crystal clear, and I get paid the extra $5

1    to try to ascertain if it is, in fact, clear.  And I just don't

2    think it is crystal clear.  That's why I spent hours going

3    through this.  And I recognize reasonable minds can differ.

4           I've read through these cases numerous times trying

5    to figure out, okay, what is the intent, what -- versus the

6    strict interpretation of the statute.  And this is the way I

7    come down, and like I say, reasonable minds can differ.

8           Respectfully, I'm going to deny the motion.  It

9    seems to the Court, I think it would be too formulaic or

10   formalistic to require the application to list every possible

11   crime.  I recognize what you said just now.  But I think, at

12   least my interpretation of *Afshari*, seems to broaden the scope

13   more than you believe, particularly when I look at "Refer to

14   any offense concerning the procurement of citizenship and

15   naturalization."  I think, particularly given the facts in this

16   case that have been articulated with, you know, bribery, I

17   think you could contemplate conspiracy to commit bribery, among

18   other things.

19          So I think there is a factual -- a basis to conclude

20   that this request could include conspiracy to commit bribery

21   even under *Afshari's* -- the interpretation of *Afshari*.

22          And then secondly, on the final action -- and again,

23   look, the folks in the circuit may disagree, and that's, you

24   know, totally fine.  I don't think that that April letter in

25   2019 is a final action, and I don't think the November letter

1    is a final action either.

2            But, you know, again, like I said, the parties did

3    an excellent job, and reasonable minds can differ.  But I

4    disagree ultimately with the conclusions of the defense.  Like

5    I said, in my mind it is a closer call than the defense would

6    characterize it.  But that's my ruling.  So the motions

7    respectfully will be denied.

8            Is there anything else we need to discuss today?  I

9    suspect there will be more litigation about this case going

10   forward, but is there anything else we need to discuss today?

11           MR. MITCHELL:  Yes, Your Honor.  Counsel had advised

12   me that they would like to seek a short continuance, and

13   counsel had emailed your CRD and cleared May 30th.  The

14   government does not object to the continuance.  I will --

15           THE COURT:  For trial or --

16           MR. MITCHELL:  For trial, yes.

17           THE COURT:  I mean, I don't -- look, my CRD has been

18   out.  So if May 30th is a good date for the parties -- let me

19   just double check and make sure I don't do anything that's

20   going to cause me to get a divorce with my spouse.  Let me just

21   see.  May 30th was the proposed date?

22           MR. MITCHELL:  Yes, Your Honor.

23           THE COURT:  That looks clear.  So if you wouldn't

24   mind just filing a stip with the Speedy Trial Act.

25           MR. MITCHELL:  Yes.  I will, Your Honor.  Would the

1  Court like to advise the defendant of his speedy trial rights

2  now?

3          THE COURT:  Mr. So, let me just talk with you

4  directly if you don't mind.

5          You have a right to have a trial within 70 days of

6  your initial appearance.  I can't remember when that was, but I

7  think we've gone well beyond that 70 days or have we not?

8          MR. MITCHELL:  We have, Your Honor.

9          THE COURT:  So my understanding is that the parties

10 have talked about moving this trial to May the 30th which would

11 clearly go beyond the 70 days.  But we can only do that if you

12 agree.  So I guess my question to you is are you okay with

13 moving the trial to May 30th of this year?

14         THE DEFENDANT:  Yes, Your Honor.

15         THE COURT:  Okay.  So I'd just ask just follow up

16 with the documentation.  You don't have to have Mr. So's

17 signature if that becomes an administrative burden.  But just

18 get a stip so we can dot our Is and cross our Ts.

19         MR. MITCHELL:  Yes, Your Honor.

20         THE COURT:  Anything further from the government?

21         MR. MITCHELL:  No, Your Honor.

22         THE COURT:  Mr. Ahn, anything further?

23         MR. AHN:  No, Your Honor.  Thank you.

24         THE COURT:  All right.  Thank you all.

25         (At 1:50 p.m. the proceedings adjourned.)

1  **CERTIFICATE OF OFFICIAL REPORTER**

2

3

4

5          I, MAREA WOOLRICH, FEDERAL OFFICIAL REALTIME

6  COURT REPORTER, IN AND FOR THE UNITED STATES DISTRICT COURT

7  FOR THE CENTRAL DISTRICT OF CALIFORNIA, DO HEREBY CERTIFY

8  THAT PURSUANT TO SECTION 753, TITLE 28, UNITED STATES CODE

9  THAT THE FOREGOING IS A TRUE AND CORRECT TRANSCRIPT OF THE

10 STENOGRAPHICALLY REPORTED PROCEEDINGS HELD IN THE

11 ABOVE-ENTITLED MATTER AND THAT THE TRANSCRIPT PAGE FORMAT

12 IS IN CONFORMANCE WITH THE REGULATION OF THE JUDICIAL

13 CONFERENCE OF THE UNITED STATES.

14

15

16          DATED THIS  15TH  DAY OF MARCH, 2023

17

18

19          /S/ MAREA WOOLRICH

20          _____
           MAREA WOOLRICH, CSR NO. 12698, CCRR
           FEDERAL OFFICIAL COURT REPORTER
21

22

23

24

25

**UNITED STATES DISTRICT COURT**